GENEVIEVE L. WILEY, Appellee, v. THOMAS J. WILEY, Appellant.

DIVORCE: Cruelty—Physical Violence—Circumstances Excusing.
1 Evidence reviewed and *held*, in view of extenuating circumstances, not to justify a divorce on the grounds of cruelty.

DIVORCE: Cruelty—Questionable Conduct of Spouse Excusing Violence. 
2 The violent language and conduct of the husband toward his wife may find excuse, though not justification, in the fact that she, by her own questionable conduct, has given him strong grounds to doubt her chastity.

DIVORCE: Defective Decree—Dismissal of Proceeding—Effect on Subsequent Action. 
3 A signed but unrecorded decree of divorce, subsequently set aside and the proceeding dismissed, is a nullity and has no bearing on a subsequent divorce proceeding.

*Appeal from Johnson District Court.*—HON. R. P. HOWELL, Judge.

FRIDAY, FEBRUARY 26, 1915.

REHEARING DENIED FRIDAY, SEPTEMBER 24, 1915.

SUIT for divorce resulted in decree as prayed.  The defendant appeals.—*Reversed.*

*Wade, Dutcher & Davis,* and *Bailey & Murphy,* for appellee.

*Ney & Bradley,* for appellant.

LADD, J.—The parties hereto were married May 4, 1910, and separated October 3d following.  Three weeks later, she filed a petition, asking to be divorced on the ground of cruel and inhuman treatment; but marital relations

1. DIVORCE: cruelty: physical violence: circumstances excusing.

were resumed on November 20th and continued until February 12, 1911, when they parted again, and on the 18th of that month, a hearing was had and a form of decree of divorce signed by the trial judge, but never entered of record.  Subsequently, these proceedings were dismissed, and on April 17, 1913, another petition, praying for divorce on the same ground, was filed.  The answer justified the conduct complained of and denied cruelty, and these are the issues to be passed on.  Was he guilty of such cruel and inhuman treatment as to endanger her life?  Both had lived in Cedar Rapids and must have known something of each other since childhood.  He was not a witness in his own behalf and little concerning him prior to their marriage, save his affection for her, appears.  Her parents did not live together amicably and were divorced sometime after she found employment and a home at the residence of Joe Dooley in Iowa City, where she remained until her marriage.  Dooley, then a single man of about 42 years, had inherited considerable property, had chronic heart trouble, known as "leaky heart," suffered from abdominal and other troubles, habitually carried a cane, and his condition was such that his physician thought it unsafe to leave him

alone.  Margaret Shaeffer had been employed by his mother, and after her death acted as housekeeper for his father.  She had survived three matrimonial ventures, each terminating in a decree of court.  Upon his father's demise, she kept house for Dooley and attended him when sick.  Into this household, plaintiff came at 16 years of age.  According to her story, she was to receive three dollars per week for her services.  A portion of the house was rented to roomers; but these were allowed to go, as the noise annoyed Dooley, and thereafter, he and the two women were the only occupants.  He often had guests in the evening and joined with them in drinking beer, as also did plaintiff, notwithstanding the protests of Mrs. Shaeffer.  When Dooley was sick—and he was afflicted with long spells of sickness—the women slept in the same room with him but in a separate bed, in order to be ready to attend him.  Aside from caring for his property, he had no business except that, in the fall of each year, he operated simple games of chance, such as "Whoop-la" and "Pick-up," at county fairs.  For several years prior to her marriage, plaintiff accompanied him, selling the tickets and attending to the drawings, while he acted as "capper" or "drummed up" patronage before the tent.  Usually both slept in the tent, though sometimes in the hotels.  When about eighteen years old, she underwent an operation for gonorrhoea, with which she testified to having been afflicted when she went to Dooley's, and this effected a cure, as she and the physician both thought.  Such had been the life and environment of the plaintiff, Genevieve Prendergrast, when she married the defendant Tom Wiley, and the subsequent happenings must be measured somewhat in the light of these.  After marriage, the parties lived at Cedar Rapids a week or ten days with his parents and her mother, and then he left her with the latter, while gone at Montezuma for a month or more, laying brick.  Upon his return, they continued with relatives a few days and he then went to Monticello upon a ten weeks' job.  She frequently visited the house of Dooley; and after defendant began work

at Monticello, he came to Iowa City late one night, and, though plaintiff was advised over the telephone by her mother of his coming, she did not meet him, and the doors of the Dooley home where she was were not opened when he knocked. On the following morning, she returned to Cedar Rapids, meeting him, and after returning to Iowa City Monday, went to Monticello, where they boarded together at a hotel six weeks. Upon their return to Cedar Rapids, she lived with her mother a while and he with his folks, then at a house her mother had rented; and later, he rented a house at 315 North Fourth street and at last they were about to set up housekeeping by themselves. But as he brought the first load of furniture to the new home, a letter came addressed to his wife, and he opened it. It was from Joe Dooley, written on the back of a letter she had written him. Let her tell the story:

"He got the letter when he went with the first load, he came back with the dray when they loaded the next time, when we went down the street he called me vile names and said I had been untrue to him because I wrote to come back to my home, and I denied it all to him. When we got into the house he bought the dray people a can of beer, and after they left he started to abuse me, slapped my face, choked me, and throwed me way across the room. My sister-in-law, my brother's wife was there at the time, I cried to her to telephone to mamma, to come, that Tom was abusing me. No, he never struck me before that time. He threatened to kill me lots of times. The first time he spoke to me about this Dooley matter was at Monticello, one night we were going up stairs and I said to him 'There is Joe Dooley' he picked up a strap lying in the corner and called him a dirty Irish son of a b——, and said if he came up he would hit him over the head, I was nervous and crying, and asked him to stay in the room with me, he didn't do it. He went and played ball with some of the fellows who were working on the street. Dooley did

not come near my room. I talked to Dooley on the street in front of the hotel. There was going to be a circus in town the next day and Dooley came to town to see if he could work. . . . When Dooley was at Monticello, I talked with him and found out what he was there for; I did not see Dooley during my married life, from the time I was married May 4th, 1910, until I left my husband, except in his home in Iowa City; after Wiley had thrown me down, I went to my mother's home, it was about 6 o'clock when I got there. I was crying and all excited, my face and neck were all red where he abused me, at ten o'clock I started to get sick at 12 o'clock I had a miscarriage.''

Her testimony as to what occurred after he had read the letter was corroborated by that of her sister-in-law and not disputed. She visited a friend at Waterloo for several days and then went to the home of Dooley, where she remained until November 20th. Counsel for appellee contend that the letter with the answer was such as to excuse the violence of her husband, and a reading of it leaves no doubt on this score. It read:

''Joe, I just come from the doctors, he said I would have to have an operation before long, and soon to, am very sick, no lie this, if you don't want me back I will go to the hospital in a week or so, and if you do will go to a Dr there and see if I possible can go with out one. Joe, I love you. I told you no lies now or in the other. Jennie.

''I love you Joe, I am so tired of Tom.''

His answer was as follows:

''October 2nd, 1910.

''Since you have had one operation here and Dr. Burge has treated you for a long time, you had better come down and see him, sometime Monday before you decide on anything. We are feeling anything but well hear, but would do anything

in our power that would be a benefit to you, or you could consult any physican you choose to. I would write you a long letter but am too nervous. You know you are always welcome and have binn asked time after time.''

According to her testimony, the difficulty for which an operation was contemplated was pregnancy in the fallopian tube. If so, the miscarriage obviated the necessity for this. She explained that the terms employed in the letter were owing to parental kindness on Joe's part and that she had no thought of that love which ''haunts the greenest spot in memory's waste.'' But her husband might well have thought otherwise; for he had objected to her having anything to do with Dooley, and other communications from the latter disclose clearly the nature of Dooley's inclination toward her. Thus, on June 16, 1910, he addressed a postal card to her at Monticello from Cedar Rapids, saying: ''My dearest Jennie: How are you today? I hope well. I have been very sick, and I sure do show it. I will be there Wednesday, if not before, for the talk. As ever Mary Lamb.'' On the opposite side of the card was a picture of an ivy with words, ''Close clings the ivy to the tree. So in my heart I cling to thee.''

Though he and Goat Abbott, a gambler, registered at the hotel under assumed names, they had the ''talk'' at Monticello. Then came the following:

''Cedar Rapids, Iowa, Aug. 21.

''Jennie, I send you picture of the home you w— beyond repair. In your h—t, do you think you have done right. I will be their when this reaches you.''

On the other side of the card was a picture of Dooley's house. Dooley explained that ''w——'' meant ''wrecked'' and ''h——t'' meant heart, and that he wrote because he felt she had not treated him right in leaving so suddenly and without notice when he was sick at the time she married. Here is another:

"Columbus Junction, Iowa, September 9th, 1910. 5 P. M. Left your town at 10 A.M. this morning, will be back tonight. Going to write a book. MARY LAMB."

On the back was a picture of young women sleeping on barrels at a railway station with the printed words: "We don't know where we're going, but we're on our way." On the same day, another was written:

"Col. Junction, Iowa. September 9th, 8 P. M. 10.

"Jennie (have you had any more treatment) like (you had) Thursday between 2-4:30 P. M. I will be up in the morning early. It is getting interesting, be sure and be down. I know you will because you said so. Be good. (————)"

On the reverse side was a picture of three semi-nude women, with feet on the table, two in the act of pouring liquor from a decanter, with printing below: "We are having a high old time." Underneath was written in Dooley's hand, "Like ———— had Thursday." The series was continued with one from Newton and another from Grinnell on the same day:

"Newton, Sept. 12, '10. Will be there in C. R. Friday. I suppose you will be at the Broken Home before, write."

On the other side were the words:

"Your smile: Though others sigh and others sing their dirges solemnly. You smile and bring the joys of spring. The breath of May to me."

"Grinnell, Iowa, Sept. 12, 1910, 2:20 P. M.
"Mrs. Tom Wiley, Cedar Rapids.

"Your kind message of Frid. just received, you don't know how happy it makes me feel. Did you have a good time Sunday and Saturday night. I hope your health continues to improve. I am sorry to say mine does not. If you have time

to ans. send to the home you broke & I will get it, will see you at the same place in C. R. as soon as I move.

　　　　　　　　　　"MARY LAMB

　　　　　　　　　　　　"Good By.

"I am very sick the strain is fierce. Do you remember one year ago today?"

On the next day he wrote again:

　　　　　　　"Newton, Iowa, September 13th, 1910.

"Seven months since February 13th, 1910. 2 years since I got a 30 page letter at this town; one year agow today I was with Mrs. Gleason today I am alone, good by—write if you can spare the time.　　　　　　　　"M. L."

He wrote from Newton and Cedar Rapids on the 15th:

"Newton, Iowa, Sept. 15, 1910. Elkader Sept. 15, 1908. If you people are in the land of the living, come back next year. C. R. Friday morning. Dont worrie, if you could only wait."

On the back is the verse: "I wonder, I wonder why you never write　A little friendly line, I'm sure I wrote the last one,　So the fault cannot be mine. If some good-natured tricky elf　Should whisper in your ear,　That I am lonesome for a letter, Wouldn't you write, my dear?"

"Cedar Rapids, Iowa, Sept. 15th, 1910. Arrived at 5 P. M. ahead of time will look over the ground and get some material for the book. Have you moved, Ha Ha. "M. L."

On the reverse side of the postal card is the picture of a bandbox with ladies' hat on top and portions of hair switch attached to the hat and a puppy-dog with nose to switch, and the words: "Ah, I smell a rat."

The plaintiff denied ever having met Dooley elsewhere than at his house, explained that the signing of "Mary Lamb"

and other allusions was mere "kidding" and that the cards
were left on the center table where her hus-
band could have read them if he had so chosen,
and denied ever having sustained improper
relations with him.   If all this were true,
however, these communications were of a character to accentu-
ate her husband's suspicions, especially in view of his objec-
tions to her corresponding with Dooley at all; and when her
letter breathing love for Dooley and saying that she was
"tired of Tom" came to him while preparing for their first
home, he could not well have felt otherwise than indignant and
angry.  Possibly these letters might not have justified his vio-
lence, but they certainly excused it.  They revealed to him
the true situation, suddenly shattering his anticipations of a
home, and caused him to doubt the love he had cherished.
What he did ought not to be denounced as cruelty, but de-
nominated the consequence of a natural impulse to resent
hypocrisy and bad faith.  Of course, explanations were under-
taken, but none given which, in view of allusions contained in
the postals, explained so as to render them consistent with dis-
interestedness.   The defendant afterwards expressed sorrow
to his sister-in-law that he had slapped his wife and declared
that he would never do so again, but his wife had gone, and
shortly afterwards began suit for divorce.   The illness of
his mother served as the occasion for writing plaintiff a
letter, and she visited the home of defendant's parents about
November 20th following, shortly after which his mother
was buried, and upon his promise of better treatment, they
took up their abode in the house he had rented until February
11, 1911.  But, according to her story, they were together but
three or four weeks of this time; for she was at DeWitt con-
siderable of the time, owing to the sickness of her grandfather,
and at her mother's much.  She testified:

> "He said he would buy my things for me and I wouldn't
> have to be asking mamma for things, he did not carry out

*2. Divorce: cruelty: questionable conduct of spouse excusing violence.*

these promises. Not one of them. He never bought me any-
thing. There was no change in his treatment of me. He
was more grouchy than ever. Sometimes we would fight and
he would call me a whore and such names as that; sometimes
he would use profanity more or less; he was awfully surly,
quarreling all the time; he had an awful temper; he threat-
ened to kill me; he told me that he would make it hot for
me if I didn't get a divorce from him right away when I
left him. When I came down to Iowa City February 13th I
left the house on Sunday morning, went to Mamma's and
stayed there and left about noon on Sunday; stayed all
night with my sister-in-law. He followed up from the club
where he belonged and wanted to know if I would go back to
the house with him. I told him no, I was afraid; he followed
up across the bridge; I told him I wouldn't go back the way
that he was; he told me that if I came back to Dooley's and
didn't get a divorce he would make it good and hot for me.
I told him that I was coming back here and that if I could
still secure a divorce I was going ahead and get it.   .   .   .
We had a big quarrel Sunday night and when he pounded me
I told him I was going back to Iowa City, and if I could pro-
cure my divorce right away and if I didn't, he would make
it hot for me or something to that effect. I came on Monday.
The quarrel was about my brother's little baby crawling
over the floor. We were playing on the floor with the baby.
I didn't open the door quick enough to suit him when he came
and he got down cellar and got to fighting her and I for
playing with the baby. Just his stubborn head. He threw
me down and my sister-in-law was going to leave; I called
her and told her she couldn't take the baby out a night like
that.   .   .   .   I left Sunday afternoon.   .   .   .   He did
not speak to me all day Sunday.''

Her sister-in-law corroborated the above, save that she
did not mention defendant's having thrown her down. That
the affair did not justify a separation is manifest. What hap-

pened doubtless was disagreeable, but in no manner endangered plaintiff's life. If he threatened to kill her, she does not pretend to have been alarmed lest he carry out his threat. If he was not good natured always, this may have been owing to temperament, or possibly he had not entirely forgotten Dooley's postal cards, or again, he may have been suspicious as to several which had come within the few days previous, the author of which was not identified. Thus, on a postal card mailed to her at Cedar Rapids, February 2, 1911, at 8:25 P.M., was written:

"TOMORROW

X E H I

L W S T"

On the reverse side at the top were the words, "Cheer Up," and at the bottom, "You know what I mean," and a picture of a woman astride a railing of a bridge in the embrace of a young man.

Another postal was mailed the same day at 12:25 P. M., on which was written: "Same Place." "1 S. Ave." On the back of this card was the picture of a young man wading in water, with the words: "Cheer up, I am coming." There was also another postal with similar capital letters on it and with words printed on the back: "Cheer up, the 'wust' is yet to come."

In fairness to Dooley, it should be added that he swore that he didn't think he wrote the above cards, and, quoting:

"I don't think I wrote anything to Jennie after she went back home. It isn't true that I wrote those cards intending to have a meeting with Jennie. I have told you I never had any meetings with Jennie, and at the outside I had never seen her in Cedar Rapids over twice. I don't think I wrote those cards, and I am positive I wasn't in Cedar Rapids at that time."

Of course, plaintiff did not know, and swore she had not heard from or seen him from November until her return

to his house in February following.   Evidently, Dooley was
not sure whether the communications were not his, and Tom
may not have quite enjoyed them, and this may explain how
he came to be somewhat "grouchy."   At any rate, there was
nothing he did warranting a finding of cruelty and inhu-
manity.   But it is said that she contracted from him a venereal
disease.   She testified:

"After I went back with Tom, he was doctoring for a
veneral disease, he had been doctoring the whole time I lived
with him I think.   I used to see stains on his clothes, I showed
them to my folks.   Dr. Murphy was giving him some kind
of Pros-titis treatment, he used to take medicine internally
and used syringes; after I was back there about two weeks I
started to have discharges I went to see Dr. Bradley, Tom
knew it, he said Dr. Murphy said not to have nothing to do
with me while he was doctoring and told me he was all right;
he thought when we got married but I always had seen these
stains on his clothes from the beginning.   He said that I
couldn't get any because it was an old one that he had years
ago; he said Dr. Murphy told him that it was an old one; I
had the disease in DeWitt, and told my aunt that Tom had
given it to me.   I did not treat with the doctors at DeWitt.
.  .  .  I was sick and couldn't work and couldn.'t keep
up a fire.   One week I stayed at mamma's after I was in
DeWitt and was sick there, and he wrote and said the water-
works had busted and my aunt said not to go into such a
house.   I had gonorrhoea then very bad.   I have it yet.
I've had a discharge continually and had to doctor and the
doctor told me I would never be well until I had an opera-
tion, my doctor is Dr. Burge."

If she "is to be believed, he was so afflicted about the
time she married him but she does not pretend to have left
him in the first instance because of this, nor to have been
assured of his recovery upon her return.   Moreover, her evi-
dence in this respect finds its only corroboration in the testi-

mony of her mother to observing stains on his garments when being shown them, except as appears in the testimony of Dr. Burge, which was as follows:

"I have known Mrs. Wiley since 1911. She has been more or less of a chronic sufferer since that time, and has been more or less under my observation and care. I have advised her to have an operation for relief of same. She hasn't been able to do it as yet. She has a chronic condition that requires attention. It is an infection of some sort; gonorrhoea or syphilis might be the cause, either one or both; some of the functions of the body are affected by it. She has been under my care at times since she came back. It varies; I presume that I have been the family physician during that time, so far as I know. I have prescribed medicines for her. I do not know of any time since she came back in February, 1911, that she has been free from this difficulty. I operated on her previous to her marriage, for her condition of peritonitis, I should say. Well it is due to an infected tube and as we say in medicine, with surrounding peritonitis, the infection was reported as specific, she had a similar infection since she came back in 1911; after the operation, for some months she seemed to be fully recovered."

It will be noted that the infection was similar to that from which she had suffered before marriage, and that the physician does not undertake to say that she had recovered, but that "for some months" this seemed to be so. As bearing on this same subject, the testimony of Dr. Love is pertinent. He was asked this question:

"Suppose that a girl of sixteen years of age, has gonorrhoea, and when she is about 19, a skillful physician performs an operation on her, and he says that at that time she seems to be cured, and then suppose that when she is about 21 years of age, she marries, and lives with her husband, and later she has a pronounced case of gonorrhoea. Now then, assuming

for the purpose of this question, that she didn't have connection with a man who infected her with gonorrhoea after the time of her marriage, would it be possible for the old gonorrhoea to infect her husband who lived with her, and for a virulent type of gonorrhoea to arise between them, due to the gonorrhoea or the case of gonorrhoea, that she was operated upon some two or three years before that?''

A. ''Well, to begin with, I don't know of any operation that could be performed on any individual for the cure of gonorrhoea, and in the second place, after an individual has been infected with the gonococci, and has gonorrhoea, after a time the tissues of that individual become immune to the attacks of this organism, and they are seemingly not suffering from the disease at all. On the other hand, if the individual having this latent gonorrhoea or chronic gonorrhoea as some call it, if they have any sexual intercourse with one of the opposite sex, the very organism that they are immune against becomes virulent and will set up an acute gonorrhoea in the second party, and this party then, after the organism has become virulent, the second party can again infect the original carrier of the host with an acute gonorrhoea. That is a fact that has been proven to the entire satisfaction of a great many observers, many times.''

Q. ''How long may one be afflicted with a dormant or an undemonstrative case of gonorrhoea after being seemingly cured?''

A. ''They may carry it for years, in fact, there are cases on record where there has been no infection, no history of any infection, since early manhood or womanhood, and it has lain for years and never shows up until after marriage and intercourse with an innocent individual.''

This tends to explain the condition of the plaintiff and probably that of defendant; and even if he also had the disease, she was not in a situation to complain, and doubtless for this reason she did not insist thereon as the occasion of leaving him. If both are tainted, neither has complained,

except in this trial, for the very probable reason that neither was able to trace the cause to the other; though on the theory of the physician, defendant's condition may have come as by him said to be possible. Though Dooley was sorely afflicted physically, the record, even if raising a suspicion, hardly justifies the suggestion that the disease is traceable to him. The evidence is in conflict as to whether defendant furnished adequate clothing and support, though there is a decided preponderance that he was somewhat negligent in this respect. Their manner of living accounts in large measure for this and, in any event, lapse in this duty is only corroborative evidence in establishing the ground of divorce alleged. The record fails to establish cruelty on defendant's part endangering the life of plaintiff, and this was essential to justify the entry of a decree. Undoubtedly, defendant could not quite forget the situation disclosed by her letter to Dooley and his wooing by postal cards. He could not treat her as before and it was not his fault. But neither what he did on October 3rd nor his discontent and "grouchiness" when they came together afterwards justified her departure. The effect was not the impairment of her health, but to furnish her an excuse to fly to the shelter of the amiable Dooley. And although the wife of another, she accompanied him at the county fairs in the fall, presenting the enticing games of "Whoop-la" and "Pick-ups" (whatever these may be), and sleeping in the tent with only a movable canvas separating them, though she testified that another slept with him. This course is said to have been pursued to save the sanity of

3. DIVORCE: defective decree: dismissal of proceeding: effect on subsequent action. Dooley, and if so, furnishes an example of self-sacrifice on her part worthy of a better cause and evidencing the strength of her attachment. But enough has been said to point out the difficulty and to indicate the cause. Undoubtedly, the defendant as well as plaintiff, supposed they were divorced by the signed but unrecorded decree which was set aside, and such was the information imparted to defendant

by the attorney for plaintiff.   But it was inadvisedly signed by the judge, for neither party had resided in the county for a year previous; and it may be that, but for the institution of a suit by Wiley against Dooley for damages in consequence of the alleged alienation of his wife's affections and the discovery of the opinion in *Hamilton v. McNeill,* 150 Iowa 470, the condition of the record in the first case might not have been investigated.   That furnishes no reason, however, for not exacting full proof of the allegations of the petition, and this even though the defendant may have courted another woman and showered her with silly postal cards.   Indeed, the ruling in *Hamilton v. McNeill* furnishes good reason for scrutinizing this record with care, not only because the law contemplates satisfactory proof of the statutory grounds for divorce, but also to obviate the escape of anyone who may have been instrumental in breaking the marriage ties from meeting the consequences of his wrongdoing.

The decree is—*Reversed.*

DEEMER, C. J., GAYNOR and SALINGER, JJ., concur.